## THE MORRIS CANAL AND BANKING COMPANY *vs.* MARTIN JOHN RYERSON.

1. In an action for a continuing nuisance, by obstructing or altering the flow of water, it is competent for the plaintiff to show the condition and value of the land at the time of the trial.

2. Such evidence is admissible, not for the purpose of proving injuries sustained after the commencement of the suit, or enhancing the plaintiff's damages by reason of such injuries, but to enable the jury to form a correct estimate of the nature and extent of the injury occasioned by the alleged nuisance prior to the commencement of the action.

3. The true consideration of a deed may be shown by parol evidence, though it vary from the consideration expressed in the deed; but such evidence cannot be received to enlarge or vary the grant itself.

4. An action may be maintained against a party who continues a nuisance erected by another, without notice or request to abate it.

5. Whether there be in fact a continuation of a nuisance by the defendant, is a question of evidence.

6. The continuance, and every use of that which is in its erection and use a nuisance, is a new nuisance, for which the party injured has a remedy for his damages. In such case no request to abate the nuisance is necessary either to be averred in pleading or proved on the trial.

7. But if the defendant simply suffer a dam, erected upon his land by a former owner to the nuisance of another, to remain without being used by him, it is no continuance of the nuisance, unless there be a request to remove it.

Morris Canal and Banking Company v. Ryerson.

8. Where it is the defendant's duty to keep a dam in repair, no notice is necessary to support an action for damages resulting from neglect of such duty.

9. If a corporation authorized by law to take lands by condemnation, enter upon land before acquiring title thereto, either by authority of their charter or by the assent of the land-holder, and build dams and construct works necessary for the purposes of the corporation, and the lands, with the works so constructed, are subsequently conveyed by the land-holder to the company, the corporation are not thereby exempted from liability for damages resulting to the land-holder from the want of proper skill and care in the construction of such works, or from their neglect to keep them in repair.

In error to the Morris Circuit.

This was an action of trespass on the case, brought in the Morris Circuit Court by Martin J. Ryerson against the Morris Canal and Banking Company, and tried at October Term, 1856.

On the trial, the judge charged the jury as follows:

The plaintiff claims damages for injuries to his land, caused, as he alleges, by the erection of the two dams and embankment spoken of by the witnesses, and their not being kept in a proper state of repair.

The defendants began the construction of the lower dam and of the embankment in the lifetime of the plaintiff's grandfather, he then being the owner of the land covered by them, and also of the lands which the plaintiff alleges were injured.

According to the evidence of Peter M. Ryerson, this was done with the knowledge and consent of his father who died shortly before they were finished, having, by his will, devised the whole of these lands to the plaintiff and his three sisters.

The defendants had the right to take the land by condemnation, as it is called, whether the owner was willing or not, that is, by an assessment through the agency of commissions, or with the consent of the owner by ordinary purchase. You are sufficiently familiar with the rights and practice of our railroad and canal companies on this subject to understand what I mean. The company chose the latter course, and they and the plaintiff agree-

Morris Canal and Banking Company v. Ryerson.

ing upon terms, he, by warranty deed, dated September 15th, 1837, but not delivered till August 11th, 1838, conveyed to them the lands then covered by the dam, by the earthen embankment, by the pond of water raised by this dam and embankment, and by the towing path.

The consideration money named in the deed is $4000, and in the absence of any proof to the contrary, the law presumes it to have been paid to the plaintiff, and according to the deed it was paid to him, as the price of the land conveyed, being 22.61 acres, and also in full for any claim of damages on his part for the destruction of his fording place across the river, and for his releasing the company from their liability to build and keep up a bridge for his use across the same river. For these three things was the $4000 paid, and there is no evidence that any other land was taken into the account, nor, in the absence of such evidence, would it be lawful or just so to consider it, the deed itself being evidence to the contrary. There is no evidence how much of this $4000 was to pay for the land conveyed, nor how much for the release of the company from their obligation to build and keep up the bridge, nor how much for the loss of the fording place, nor any evidence whether the sum paid was a large or a small consideration. The parties having agreed upon this sum, the presumption of law is that it was a fair equivalent for the things conveyed; and whether it was or not is perfectly immaterial, and cannot in any manner change or affect the rights of these parties. All such considerations ought to be dismissed from the case, just as much as all considerations calculated to excite a prejudice against the defendants, from the fact of their being a corporation. Although a corporation, they have been a very useful one to the state, and whether useful or not, are entitled to the same consideration and the same rights at the hands of the court and jury as a private citizen; so this deed is to be treated and construed by the same rules as all other deeds, and you are to ascertain the meaning of the par-

ties and their bargain from the deed itself, not allowing the consideration named in it to have the least weight, one way or the other, the law presuming that the parties understood their own interests, and made such a bargain as they considered most beneficial. If the company thought otherwise they could have had the value of the land and the damages assessed by commissioners.

The important inquiry is, what were the rights of the respective parties under the deed. The company became the owners in fee simple of the lands conveyed, and acquired the right to keep up and maintain the dam and embankment. as they were in August, 1838, without being liable to the plaintiff for any damages which might thereafter result from them to his adjacent lands; provided always, that they were then constructed with proper care and skill, and were kept in a proper state of repair.

The fact of their being erected at the time of the conveyance does not preclude the plaintiff from setting up that they were then improperly constructed, nor from showing that they were not kept in a proper state of repair. Had he or his grandfather erected them for their own purposes, and then conveyed the lands to a private individual, the case would be different, and they would have to submit to the consequences of their own erections. It would then be like the cases instanced by counsel, of a man's erecting on his own land a manufacturing establishment which was a nuisance, and then selling it. He could not afterwards complain of its continued use by the purchaser.

But in this case the company made the erections, and had a right, under their charter, to take the land, and make them to suit themselves, whether the land-owner was willing or not; and if they could not agree for the price of the land and damages, to have an assessment by commissions. The effect of the lower dam and of the embankment was to keep back the water, and dam it up

in large quantities, so that in case of a breach in the embankment at the upper end of the plaintiff's land, the effect of a freshet would be much more injurious to him than if there had been no dam. In view of this, it was the duty of the company to construct the embankment of sufficient strength to resist the usual freshets of the river, such as had occurred before then, and were likely to occur again; but they were not bound to guard against such extraordinary floods or contingencies as no prudent man could reasonably anticipate.

With this view of the law, how does the case stand?

The plaintiff complains of injury to several parcels of his land, which will be considered separately.

*First,* the meadow east of the slank, designated on the map as the lower yellow, which he alleges has been injured by soakage through the embankment. There is no allegation of the soil being washed out by the breach at the upper dam, but the whole complaint is of soakage. To make the defendants liable for this, it must appear that the embankment was not constructed with sufficient care and skill to prevent it. There is no sufficient evidence to show this, but, on the contrary, all the witnesses on this point have testified the other way; and in the absence of such evidence the plaintiff's deed will prevent his recovery of any damages that he may have sustained thereby. As to the two other lots, one on each side of the slank, and also colored yellow on the map, the complaint is that they have been injured in consequence of breaches at or near the upper dam.

At the date of the deed there was no dam at this place, but a continuous embankment, extending up from the lower dam, with a wooden sluiceway, where the upper dam is, to convey under the embankment water sufficient for a watering-place. The plaintiff had a right, if this embankment was continued, to demand that it be maintained strong enough to resist the ordinary freshets, and the company had no right, for their own convenience, without the

consent of the plaintiff, to substitute the crib dam, if thereby more injury would be occasioned to him than by such a bank as they were bound to maintain. The crib dam was built by the company, in the year 1841 or 1842, and they were bound so to build it, and so to connect it at each end with the embankment, that it would withstand the ordinary freshets. The first question, therefore, for you to settle is, were the dam and embankments thus properly constructed and properly joined together and kept in proper repair. As to the mode of constructing and joining them together, the most material evidence is that or Peter Hopper, Peter M. Ryerson, Garret Smith, and Mr. Unoughst. Their evidence, in connection with the evidence of the frequent breaches and repairs, and the unfinished state in which the dam was left, tends strongly to make out the want of sufficient skill, care, and precaution. The embankment gave way in the first or second year after it was constructed. There have been several breaches in it since, and there is no evidence that these were occasioned by extraordinary freshets or extraordinary contingencies, except the breaches of 1849 and 1854. These frequent breaks are a strong circumstance to make out a want of sufficient skill, care, and precaution in the construction or repairs of the embankment.

If you should be of the opinion that there has been such a want of skill, care, and precaution, either in the original erection or in the repairs, and that in consequence the plaintiff's land has been injured, are the defendants liable for that injury? And if so, to what extent? They cannot be held liable for any injuries prior to October, 1844, in consequence of the sale and conveyance under the mortgage which has been given in evidence. It is unnecessary to detain you by giving you the reasons for this conclusion; and if the plaintiff should be dissatisfied with my opinion, an opinion expressed only for the purpose of this trial, it can be reviewed hereafter in this or in a higher court. You will therefore confine your attention

Morris Canal and Banking Company v. Ryerson.

to injuries received since October, 1844, and inquire next whether the injuries were greater than would have occurred had the river been in its natural state, without the dams and embankment; this excess of injury is all that the plaintiff can recover for.

There is contradictory evidence as to the number of breaks occurring since October, 1844, but there is no occasion for my detaining you by comments upon it, it being fresh in your memory, and having been fully and ably discussed by counsel, except to call your attention to the one of February, 1849, and the one of April, 1854.

It is insisted by the defendants, that the former was occasioned by the ice adhering to the sheet planking, with which the dam was faced, so firmly that a slight freshet occurring then raised the ice and planking together, and gave the water an opportunity to work its way beneath the planking, and thus occasion a breach; and that no reasonable foresight or precaution could have been expected to anticipate and guard against this contingency. If this be so, then the defendants cannot be held answerable for the effect of this breach.

It is also insisted by the defendants, that the breach of 1854 was occasioned by a freshet so universal and extraordinary that they could not have been expected to anticipate it, and were not bound to guard against it. If this be so, then they cannot be held liable for the effects of this breach, unless the embankment was at that time insufficient to resist an ordinary freshet. In determining the extent of the injuries, you can take into consideration the actual damage done to the land by washing off the soil, covering it with sand, gravel, and stones, washing holes and gullies, widening and deepening the slank, and thereby rendering it more difficult for the plaintiff to cross to his land, and the injury done by washing away or otherwise destroying the growing crops; and, from all these circumstances, determine how much the annual value was lessened during the years in question.

Morris Canal and Banking Company v. Ryerson.

The plaintiff has shown a sufficient title to all the land alleged to have been injured. Even if the boundaries, as given in the deed, do not include the whole of it, his possession and that of his grandfather are sufficient evidence of his title.

I shall not attempt to review the evidence on the question of damages—that has been done, and well done, by the respective counsel. You have patiently listened to the testimony ; several of you have viewed the premises, and as it is your peculiar province to decide upon the facts, I am glad to be relieved from the necessity of further remarks upon this part of the case.

It is insisted, upon the part of the defendants, that there can be no recovery whatever on the ground that, since the sale and conveyance under the mortgage, no proper notice has been given to them to take down or repair the dam. There is nothing in this objection to prevent a recovery, and you need give yourselves no trouble on that point.

The case, gentlemen, is now with you, and I doubt not that, laying aside all considerations as to the parties, who and what they are, and regarding only the law and the evidence, you will render such a verdict as will do what is right and just to both of them, measuring out to them such justice as you would wish to be meted to yourselves.

On the trial, several exceptions were taken by the defendants to the ruling of the court on the admission of evidence, and also to the charge to the jury. These exceptions sufficiently appear in the opinions delivered in this court. A verdict was rendered for the plaintiff. The defendants below are plaintiffs in error.

Argued at February Term, 1859, before the CHIEF JUSTICE, and Justices OGDEN, VREDENBURGH, and VAN DYKE.

*F. T. Frelinghuysen*, for plaintiffs in error

*Zabriskie*, for defendant.

The CHIEF JUSTICE. The action was brought in the court below, by Ryerson against the Morris Canal and Banking Company, for damages alleged to have been occasioned to the plaintiff's land by the works of the defendants. Judgment having been rendered for the plaintiff, the cause was removed into this court by writ of error, issued at the instance of the defendants below.

The first error assigned is, that the plaintiff, upon the trial, was permitted, in the language of the exception, to offer evidence to show the value of the land before the commencement of the action, and its condition at the time of the trial. The ground of objection to the evidence is, that as no damages can be lawfully recovered for injuries sustained by the plaintiff after the commencement of the suit, evidence of the existence of such injury necessarily tends to prejudice the rights of the defendants by enhancing the damages in the estimation of the jury. The witness, in detailing evidence objected to, after stating the value of the land in 1854, immediately before the commencement of the suit, added— "there is no difference between its present condition and what it was in 1854." It is not perceived that the evidence can, by any possibility, have prejudiced the defendants' rights, and its admission, therefore, can constitute no ground of error. But, whatever the answer might have been, the evidence was properly admitted. In every action for a continuing nuisance by obstructing or altering the flow of water, a large portion of the evidence will necessarily have reference to the condition of things at the time of the trial. If a view of the premises be had, (as is usual,) the knowledge of the jury will be limited exclusively to the condition of the premises and to the cause and extent of the injury, as they appear at the time of the view. And they must arrive at a correct estimate of the character and extent of the injury occasioned by the alleged nuisance prior to the commencement of the suit, by comparing the testimony of the witnesses with their own obser-

vations, and testing its value by facts within their own
knowledge. So witnesses are permitted to speak of the char-
acter of the obstruction, of its influence upon the water, and
of the condition of the premises injured, as they exist at or
about the time of the trial, not for the purpose of re-
covering damages for injuries sustained after the com-
mencement of the suit, but for the purpose of furnishing
the most precise and reliable information as to the nature
and extent of the injury, and thus enabling the jury
by comparison, to judge of the amount of damages re-
sulting from the alleged nuisance prior to the commence-
ment of the action. The character of the answer fur-
nishes conclusive evidence that such must have been the
design of the testimony which forms the subject of the
present exception.

The *second* error assigned is, that the court overruled evi-
dence offered by the defendants to show that the lands
adjoining and below the plaintiff's are affected by sand below
the dam, just as the plaintiff alleges his meadow is affected
by the dam. The mere fact that the sand was carried upon
the lands of others from causes independent of the dam, had
no tendency to prove that the sand carried on the plaintiff's
land was not occasioned by the dam; nor could the proof of
injury sustained by others diminish the damages occasioned
by the injury done to the plaintiff. The offer should have
gone further, and proposed to show that the injury to the
plaintiff's land did not result from the defendants' dam.
No such offer was made, and the evidence was properly re-
jected.

The *third* error assigned is, that the court overruled
evidence offered by the defendants to show the actual
value of the land conveyed by Martin John Ryerson,
the grandfather of the plaintiff, to the defendants, and that
the $4000, mentioned as the consideration of the said
deed, was also for all damages he might afterwards sus-
tain to other lands from the erection of a dam and em-
bankment, and that such was the agreement at the time.

By the terms of the deed, there was conveyed to the defendants, for the consideration of $1000, 22.61 acres, strict measure, including the land occupied by the Pompton feeder of the Morris canal, with the necessary embankments and towing path, the land overflowed by reason of the dam across the river, the land occupied by the guard-bank connected with the dam, and the land lying between the river and the guard-bank; the above consideration being also in full for any claim for damages the party of the first part might have in consequence of the fording place across the Pompton river being destroyed. The offer of the defendants was to show by parol, that the consideration of the deed was also for all damages the grantor might afterwards sustain to other lands from the erection of a dam and embankment, and that such was the agreement. If the offer was to show that the $4000 was a consideration for all damages sustained by any dam and embankment, and that the defendants thereby acquired a right to erect a different dam and embankment from that subsisting at the date of the deed, and thereby to overflow other lands of the grantor; the evidence was incompetent, not only as being an offer by parol to contradict and vary the terms of the deed, but also because it was an attempt to establish a right or interest in land by parol. The true consideration of a deed may be shown by parol, though it vary from that expressed in the deed. But the offer of the defendants was, not to show the true consideration of the conveyance, but to vary and enlarge the grant itself—to show that rights were intended to be granted which were not included within the terms of the conveyance, either expressly or by implication. If, on the other hand, the defendants, by their offer, merely proposed to prove that they bargained for and acquired a right to maintain the bank and embankment as they existed at the delivery of the deed, without being liable for damages by reason thereof, the offer went no further than the legal import of the deed itself. It was a mere attempt

to establish by parol the legal construction of the instrument. The true interpretation of the conveyance, and the rights of the grantees under it, are thus clearly stated in the charge of the court to the jury. "The company became the owners in fee simple of the lands conveyed, and acquired the right to keep up and maintain the dam and embankment as they were. in August, 1838, without being liable to the plaintiff for any damages which might thereafter result from them to his adjacent lands; provided always, that they were constructed with proper care and skill, and were kept in a proper state of repair." Although one of the counts of the declaration claims damages resulting from the erection of the dam and embankment, yet the charge of the court clearly excludes from their consideration all damages resulting from that cause alone.

The *fourth* error assigned is, that the court instructed the jury that no notice was necessary to be given to the defendants to take down or repair said dam before the bringing of the suit, and that the plaintiff was entitled to recover damages which had accrued before the giving of such notice. The error is sought to be established upon the broad principle that an action cannot be maintained against a defendant, for the continuance of a dam or other nuisance on his land, erected by another, unless he refuse to remove it after request. The doctrine, thus broadly stated, is derived from Penruddock's case, 5 *Coke* 100, (40 *Eliz.*) and receives apparent countenance from other more modern authorities, *Winsmore* v. *Greenbank, Willes* 583; *Brent* v. *Haddon, Cro. Jac.* 555 (17 *Jac.* 1); 1 *Chitty's Pl.* (7th ed.) 101, 423; 2 *Ibid.* 770, note *h,*; 2 *Saund. Pl. & Ev.* (2d ed.) 686. None of these cases, properly considered, support the doctrine contended for. The very reverse of the proposition is law. An action may be maintained against a party who continues a nuisance erected by another without a request to abate it. If the request to abate the nuisance be necessary to maintain the action,

in all declarations for the continuance of a nuisance, an averment of a request to abate it would be necessary. But the precedents are otherwise, and there is no authority requiring it. In 1 *Chitty* 423, it is said that in a declaration against the mere continuer of a nuisance, it is advisable to state that he was requested to remove it. See, also, 1 *Chitty* 101. And in 2 *Chitty's Pl.* 770, *note h,* it is said that if the action is not brought against the original erector of the nuisance, but against his feoffee, it may be necessary to allege a special request to the defendant to remove the nuisance. But the precedent contains no such averment. If the defendant continue the nuisance, though not erected by him, he is liable. Whether there be in fact a continuance of the nuisance by the defendant, is a question of evidence. If the defendant, by any active participation of his, assent to the wrong, if, for instance, he repairs the dam, and holds back the water upon his neighbor for the use of his own mill or canal, he continues the nuisance, and no request to abate it is necessary. But if the defendant simply suffer a dam erected upon his land by a former owner to remain without being used by him, it is no continuance of the nuisance, unless he be first requested to remove it. The position of the grantee of land, having a nuisance erected upon it before he acquires title, and which is afterward suffered to remain, is precisely analogous to that of the owner of the land upon which a third party should wrongfully enter and erect a nuisance. If A should enter upon the land of B, and wrongfully, and without the consent and concurrence of the owner, erect a dam to the prejudice of C, B would not be liable for A's wrongful act in erecting the dam, nor for its continuance upon his land, until he was requested to abate it. And in such case, if the pleader, in a declaration against B for the nuisance, should aver that A erected the nuisance upon B's land, and B suffered it to remain, he must go further, and aver a request to B to abate the nuisance. The re-

quest is a material fact, essential to constitute the plaintiff's right of action. But if B should appropriate the dam, thus wrongfully erected by A, to his own use, and should maintain and continue the dam for his own purposes, such acts are a continuance of the nuisance, and no request to abate the nuisance is necessary, either to be averred in pleading or proved upon the trial. It is obvious, from this statement of the principle, that it may often become a material question upon the trial of a cause for a continuance of a nuisance, whether in point of fact the defendant did, or did not, continue the nuisance. And hence, as stated by Chitty, it may be advisable in all such cases (though not necessary) to aver a request to abate the nuisance before the action is brought. A regard to this distinction between the continuance of the nuisance by the defendant, and his merely permitting it to remain, and between the legal wrong and the facts necessary to constitute the wrong, will reconcile most, if not all, of the apparently conflicting authorities to be found in the books upon the subject.

Thus in *Moore* v. *Browne*, 3 *Dyer* 319, *b*, which was an action on the case for diverting the water of a conduit pipe, it appeared that the husband of the defendant had attached to the main a small pipe with a cock, thereby drawing water at pleasure to serve his house. The wife continued to draw after his death, and the action was against her; and whether she should be adjudged guilty upon this diversion, because she was not the first who diverted, but her husband was, and the wife only a continuer of the diversion, was doubted. "But (to use the language of the reporter) because the portion of water turned aside had not continual course of running, but was oftentimes stopped by the cock, and opened again at the pleasure of the wife, *toties quoties*, that may be called, in her, a new diversion, and so she was found guilty; and so was the opinion of the justices in banc." The clear principle of the case is, that an act of hers appropriating the water to her use, thus recognizing and sanctioning

Morris Canal and Banking Company v. Ryerson.

the wrongful act of the husband, was a continuance of the wrong, and made her liable for damages. The court surely did not mean to declare that, if she used the water occasionally, she was liable; but if the cock happened to be turned, and the water running at the moment of her husband's death, she might have suffered it to flow, and used it perpetually without wrong. The principle can rest upon no such point as that. She was liable because she, by her act, assented to, and thereby adopted, the wrongful act of her husband, and so continued the nuisance erected by him. But, standing upon the letter of the decision, it is clear that the turning of the cock was no more a new diversion of the water, than closing the gates of a mill, and thereby raising the head of water after it has been drawn down, would be a new overflow of the plaintiff's land.

The continuance, (says Mr. Justice Sewall, in delivering the opinion of the Supreme Court of Massachusetts,) and every use of that which is in its erection and use a nuisance, is a new nuisance, for which the party injured has a remedy for his damages. *Staple* v. *Spring*, 10 *Mass.* 74.

In *Hughes* v. *Mung*, 3 *Har. & McHenry* 441, the action was brought against the owner of land, for the diversion of a water-course from the land of the plaintiff to the land of the defendant, made by the father of the defendant when he was owner of the defendant's farm. On the trial, the plaintiff offered evidence to prove that the stream, as diverted, flows through land claimed by the defendant. That the defendant, since his title to the land was acquired, has used the stream of water in the channel in which it now runs, by watering his stock therein, by enclosing it within his fences, and occasionally throwing it out upon his meadow. The court were of opinion, and so directed the jury, that an action will lie for the diversion of the water-course against the person who diverted it, and against any person who keeps up the obstruction which changed the water-course; but no adven-

titious accidental advantages, derived from the use of the water running in its present course, will amount to a continuance of the nuisance, without some act done by the defendant to keep up the obstructions occasioning the diverting of the course of the stream; and that the action could not be supported without showing that these acts were done since the title of the plaintiffs accrued to their lands. This opinion was subsequently affirmed in the Court of Appeals.

The whole doctrine, of the necessity of a request to abate a nuisance, is derived, as has been said, from Penruddock's case. That was a writ of "*quod permittat prosternere*," brought to abate a nuisance occasioned by the erection of a house on the defendant's land, so near the land of the plaintiff, that the water fell from the roof of the defendant's house upon the curtilage of the house of the plaintiff. Clark, the plaintiff, purchased his premises after the erection of the nuisance. Penruddock, the defendant, also purchased his premises after the house which occasioned the nuisance had been erected thereon; so that the action was brought by the feoffee of the premises injured, against the feoffee of the premises which occasioned the injury. The question was, whether the feoffee of the premises injured could maintain the action for the nuisance and wrong done in the life of his feoffor. The objection was, that if the owner of the land to which the injury was done convey the premises, the wrong is remediless, for the feoffee shall take the land in the same plight that it was conveyed to him. The court, however, resolved that the distilling of the water in the time of the feoffee was a new wrong; so that the permission of the wrong, by the feoffor or the feoffee of the premises where the nuisance was erected, to continue to the prejudice of another, shall be punished by the feoffee of the house to whom the injury was occasioned. And if the same shall not be reformed after request made, the *quod permittat* lieth against the feoffee, and he shall recover damages if he

doth not reform it; but without request made, it doth not lie against the feoffee. It is remarkable that so accurate a writer as Judge Greenleaf treats the case as authority for the necessity of a request to abate the nuisance, only where the action is brought by the grantee of the house to which the nuisance was committed in the time of his grantor. 2 *Greenl. Ev.*, § 472. But treating the case as an authority for the necessity of a request to abate the nuisance, only in cases where the premises upon which the nuisance is erected have been conveyed, and giving it its full weight, it renders the request to abate necessary only where the defendant merely permitted the wrong to continue. It is obvious that the defendant did no act assenting to the wrong, or appropriating it to his use, and thereby adopting or continuing the nuisance. He was, therefore, no more liable for the injury, than he would have been if a stranger had entered upon his premises, and placed a nuisance there without his assent. The case is in strict accordance with the principle adopted in Hughes *v.* Mung, viz., that the defendant's living in the house did not amount to a continuance of the nuisance by him.

The earlier case of *Beswick* v. *Cunden*, Cro. *Eliz.* 402, 520, does not conflict with this principle. In that case the dam was erected by the defendant himself, but the property injured was conveyed to the plaintiff after the dam was erected. The action was brought for the continuance of the nuisance. The argument, as in Penruddock's case, was, that the nuisance was committed before the plaintiff acquired title, and the tort was extinguished by the feoffment, and nothing new was done since the feoffment to the injury of the plaintiff. And that opinion, upon the argument, was entertained by a part of the court. But subsequently all the justices agreed that the action was well brought. But the case being again argued, the court held that the action could not be maintained, on the ground that there was no offence done by the defendant, for he did not do anything; and therein

the case was distinguished from the case in 4 *Ass.*, *pl.* 3, for there the using was a new nuisance. In this latter report of the case, it is not stated that the dam was erected by the defendant; and if that were the fact, and if, as appeared from the case, the defendant merely suffered the dam to continue, without doing anything to it or using it, he did not continue the nuisance; and the case, so far as it can be considered an authority at all, is not in conflict with those already referred to.

The same distinction is very clearly stated in 2 *Saund. Pl. & Ev.* 686. "Though, in torts, the assignee of an estate is not liable for an injury committed before he came to the estate, yet, if he continue a nuisance, he will be liable for such continuance. And every occupier is liable for the continuance of the nuisance on his land, though erected by another, if he refuse to remove it after notice." In other words, the defendant is always liable if he *continue* a nuisance erected by another; and if he suffer it to remain on his land after a request to remove it, that is, in law, a continuance of the nuisance by him. The necessity of the request to abate the nuisance is not founded on the principle of bringing home to the defendant a knowledge that the act done operates as a nuisance. The doctrine of the *scienter* does not apply. A wrongful act is equally a tort whether the defendant knows or was ignorant of its injurious effects. Nor is it necessary to charge the defendant with a malicious intent, for that is not the essence of the wrong. The only principle upon which the request is essential, is to bring home to the defendant a voluntary continuance, and consequent adoption, of the act which constitutes the nuisance.

The case of *Pierson* v. *Glean*, 2 *Green* 36, seems to go further, and maintain the principle that the party upon whose land a dam is erected by another, which overflows the land of an adjoining proprietor, is not liable for the continuance of such nuisance before a request to abate it; although he appropriate the dam to his own use, and thus

Morris Canal and Banking Company v. Ryerson.

continue the nuisance. The point is not distinctly made by the pleadings, nor does it appear that the attention of the court was drawn to the fact that the defendant had used the dam, or kept and maintained it otherwise than by suffering it to remain upon his land. The plea avers that the dam was erected, kept up, and maintained before the defendant acquired title, and that he had never since been requested to abate the nuisance. The demurrer to the plea was overruled. And the plea was undoubtedly good, and the decision correct, unless there was a sufficient averment in the declaration that the defendant had not merely suffered the dam to continue upon his land, but had used it for his own purposes, and became liable for a continuance of the nuisance. It is not the erection of a dam, but the holding back of the water upon the plaintiff's land, that constitutes the nuisance; and had the plaintiff, instead of demurring to the plea, replied that the defendant had so held back the water, and had, by means of the gates, from time to time overflowed the plaintiff's lands, the case would have been brought directly within the authority of *Moore* v. *Browne*, 3 *Dyer* 319, *b.*

But, admitting the authority of Pierson *v.* Glean in its broadest extent, the principle extends only to the case of a nuisance created by a wrongful act done or committed, not to a mere neglect of duty. The complaint here is, not that the defendants wrongfully maintained the dam, but that they neglected to maintain and keep in repair the guard-bank erected to secure the plaintiff's land from injury resulting from the erection of the dam. If it was the defendants' duty to maintain and keep in repair the guard-bank, no notice can be necessary to sustain an action for damages resulting from neglect of such duty. This brings us to the four remaining errors assigned by the defendants, which involve the obligations of the defendants in regard to the repair of the embankment, and the correctness of the judge's instructions upon that point.

The defendants had, under the authority of their charter, or by the assent of the owner, entered upon the lands, constructed their works, erected a dam across the river, and an embankment to prevent the overflow of the water upon the plaintiff's lands. Having completed the works, the land-owner executed the deed in question. The judge charged the jury, that "the defendants were not liable for any damages which might thereafter result from the dam and embankment, provided they were then constructed with proper care and skill, and were kept in a proper state of repair. The fact of their being erected at the time of the conveyance does not preclude the plaintiff from setting up that they were improperly constructed, nor from showing that they were not kept in a proper state of repair. The company made the erections, and had a right, under the charter, to take the land, and make them to suit themselves; and if they could not agree for the price of the land and damages, to have an assessment by commissioners. The effect of the lower dam and embankment was to keep back the water, and dam it up in large quantities, so that, in case of a breach in the embankment at the upper end of the plaintiff's land, the effect of a freshet would be much more injurious to him than if there had been no dam. In view of this, it was the duty of the company to construct the embankment of sufficient strength to resist the usual freshets of the river, such as had occurred before, and were likely to occur again; but they were not · bound to guard against such extraordinary floods or contingencies as no prudent man could reasonably anticipate. * * * You will inquire whether the injuries were greater than would have occurred had the river been in its natural state, without the dams and embankments; this excess of injury is all that the plaintiff can recover for."

The exceptions to this charge are founded either upon isolated expressions, or upon a misapprehension of its fair scope and meaning. It does not treat the dam as a nui-

sance; on the contrary, the jury are expressly instructed that the defendants are not answerable for damages resulting from the dam and embankments, provided they were properly constructed and kept in a proper state of repair. Nor does it claim that the defendants are bound to keep all freshets from the plaintiff's land, or to guard against their effects, further than is involved in the maintenance of the works, as they were at the time of the conveyance. Nor does the conveyance preclude the plaintiff from showing that, at the date of the deed, the works were improperly or insufficiently constructed. The whole fallacy of the argument consists in assuming that the works, as constructed, were the works of the land-holder; that they were virtually constructed by him, and that he sold them to the company; and that therefore, the company cannot be liable for any defect in their construction. The real transaction appears to be, that the company entered upon the land under the authority of their charter, or with the assent of the land-holder, and constructed their works without having acquired title. And when the quantity of land required for the use of the company, the precise character of the improvement, and its effects upon the property of the land-holder were thus ascertained, the value of the land and the damages were agreed upon, and a conveyance executed accordingly. The object of the embankment or guard-bank was, according to the defendant's own showing, not only to complete the dam, but also to protect the meadows. Neither purpose can with propriety be called secondary within the contemplation or the contracting parties. If the purpose of navigation was the primary object of the company, the protection of his meadow was the primary object of the land-holder. The maintenance of that guard-bank, and the keeping of it in proper repair, must have entered into the contract, and formed, in the contemplation of the parties, a material element in fixing the consideration to be paid. It is true that the company were not required to construct it

higher, or longer, than it was at the date of the contract; but they were bound, by the contract, to afford to the land-holder the protection which the then existing bank, properly constructed, purported to afford. Upon that basis the land-holder contracted, and he is entitled to all the protection which the contract fairly affords him. If the company merely keep the guard-bank in such condition as to serve their own purposes, but suffer it to become so defective as to vent the water to the prejudice of the land-holder, they are answerable for the injury. The sixth exception, relative to this part of the case, is to so much of the charge as instructed the jury that the conveyance did not prevent the plaintiff from complaining of the insufficiency *or improper construction* of said dam and embankment at that time. This language is equivocal. It may import that if the dam was not sufficiently high or long to protect the plaintiff's meadows, he might recover damages on that account. That was not the purport of the charge. It clearly relates to the skill and care with which the existing dam and guard-bank were constructed, and not to the extent of the work.

The charge, as delivered, covered the whole ground of legal controversy in the cause, and there was therefore no error in the refusal of the court to charge as further requested by the defendants.

The judgment should be affirmed.


Justices OGDEN and VREDENBURGH concurred.


VAN DYKE, J., (dissenting.)  This suit was brought by the plaintiff to recover of the defendants for damages done to his lands, by the erection, continuance and imperfect condition of certain dams and embankment across or along Pompton river. The works were erected in the construction of a feeder, or branch of their canal. The plaintiff became the owner of all the lands in question, as well those claimed to be injured as those covered by

the dams and embankment, and pond produced thereby, on the 15th of September, 1837, by the will of his grandfather, proved on that day. By a deed, acknowledged on the 11th of August, 1838, the plaintiff conveyed to the defendants 22.61 acres of land, which then contained, among other things, the dams and embankment complained of, which were then completed.

The plaintiff, after having shown his title, and offered a number of witnesses to prove the damages done to his adjoining lands, by soakage, overflow, washing the deposit of sand and gravel, &c., caused, as was alleged, by the erection and breaches in said dams and embankment, rested his cause; and the defendants, on their part, offered to prove, among other things, the actual value of the lands conveyed by the plaintiff to the defendants, at the time of the conveyance, and that the consideration of $1000, mentioned in the deed, was not to pay for the lands conveyed merely, but was also intended to cover over and pay for, in advance, all damages which the plaintiff might sustain to his other lands from the erection of the dams and embankment in question, and that such was the agreement of the parties at the time. To the admission of this evidence the plaintiff objected. The court sustained the objection, and refused to admit the evidence. To this decision of the court the defendants excepted, and it is now before us on the bill of exceptions prayed and allowed.

In this decision I think the court erred. If the defendants could have proved distinctly what they offered to prove, it should have operated as a perfect defence, and should have prevented such a verdict as was rendered; and, from the offer of the evidence, and its rejection by the court, we are bound to assume that such evidence existed at the time, and would have been exhibited to the court and jury, if permission had been given.

The reasons given for the rejection of this evidence are—

1. That the agreement, whatever it was, was reduced to writing, and inserted in the deed, and that no parol testimony could be admitted to contradict or affect at all what is written. But the evidence offered is in no way inconsistent with the deed, nor does it in any manner contradict it. It is offered to prove a transaction and agreement between the parties which was connected with the deed, and collateral to it, but which formed no necessary part of it, and was not therefore inserted in it, but was, nevertheless, a perfectly lawful and proper agreement, in no way affecting or impairing the deed itself, and should, I think, have been received in evidence when offered, and as offered, unless the second reason urged for its rejection is to prevail. The evidence was not offered to impeach or impair the deed, or in any way whatever to disturb or assail it. The deed itself, and the consideration mentioned in it, were to remain just as valid and effectual, in all respects, as if the evidence had not been received or offered. So far from the defendants offering to weaken or impair the deed in any of its features, they rely on it expressly for their defence, but only offer to prove that, at the time of making this deed, an agreement was entered into between the parties, not inserted in the deed, nor otherwise reduced to writing, that the defendants should also pay in advance for damages which might be done thereafter to the other lands of the plaintiff, and which amount, thus allowed for damages, was, by consent, added to the consideration intended to be inserted in the deed. This is surely no contradiction of the deed, nor an attempt in any way to weaken its force by parol testimony; all that can fairly be said against it is, that it is an offer to show that the real consideration or price paid for the land purchased was not precisely that which appears in the deed. This has been done repeatedly, and is perfectly lawful.

2. It is insisted that the evidence offered was to prove the purchase and existence of an *easement,* which can only be proved by deed. It is conceded that an easement can

only be created by deed or by prescription, and that there was no offer to prove either. But I cannot see that the offer was to prove the existence of an easement or any other claim of ownership in real estate. The defendants did not offer to show that they had contracted for any *right* or interest whatever in the plaintiff's lands, either to use them or to overflow them, but they simply offered to prove that, being about to purchase of him certain lands and premises on which these works had just been erected, and the plaintiff owning at the time other lands immediately below and along the embankment, which it was feared might, by some accident involuntary on their part, from flood or otherwise, be damaged: and with a view to avoid any future difficulty from any such cause, they agreed to pay him in advance, and did in fact pay him in advance, such sum as would cover any possible damage to his lands, arising thereafter from a breach of the embankment or otherwise, for which they might be legally responsible; that the plaintiff agreed to such arrangement, and actually received the money in full for such possible future damage, and had the amount added to the consideration in the deed for the lands actually conveyed. This is what I understand to be the offer. It is not proof of an easement, but was the adjustment of damages. And where suit is brought to recover these very damages, the defendants should be allowed to show that they have been already paid and received by the plaintiff. To refuse them, is to compel them to pay twice over.

But suppose the evidence offered is to be construed into a parol agreement for an easement—the *right* to overflow the plaintiff's land—does it follow, where the contract has been so far performed that the purchaser has paid the whole of the purchase money, and the grantor has received it, and has it in his pocket, that he can keep it there, and at the same time set up the statute of frauds against his adversary, and hold the agreement to be void because not in writing? Can he receive and retain the

purchase money, and also recover damages for the use of the lands which he has thus parted with? This seems impossible. And yet it is the very state of things alleged by the defendants, and offered to be proved. And why should they not be allowed to defend themselves by such proof? Why should they be compelled to pay for the use of or damage to these lands twice over, by being denied the right to show that they had paid for them once already?

If these defendants had themselves instituted proceedings to enforce a mere parol agreement for an easement, which had not in any part of it been performed, the objection would be well taken; but where the contract, verbal though it be, has been really performed in all its essential features by both parties, by the payment of the money by the one, and the receipt of it by the other, the same rule does not prevail, but the contract under such circumstances is just as valid as if it were in writing, and just as proper to be received in evidence, and especially so, when it is absolutely necessary to prevent injustice that it should be so received.

It is not difficult to imagine, from the evidence in the case, the existence of the state of things offered to be proved by the defendants. The value of the lands in the immediate vicinity of those described in the deed are variously estimated by the witnesses of the plaintiffs, at from $40 to $100 per acre, an average per acre of about $75, while those conveyed by the deed, according to the consideration mentioned, brought nearly $180 per acre. That the $4000, therefore, mentioned in the deed covered something else than the mere land conveyed, is quite possible; at all events the defendants asked permission to prove that it was so, and that it covered the same damages now sued for. This was denied them, and the result is, that they have them to pay over again, if this verdict and judgment are to stand. This is clearly erroneous, and the judgment should be reversed for this reason.

Morris Canal and Banking Company v. Ryerson.

Exception is taken, also, to that part of the charge of the judge which is as follows:

"You will therefore confine your attention to injuries received since October, 1844, and inquire next, whether the injuries were greater than would have occurred had the river been in its natural state without the dams and embankment. This excess of injury is all the plaintiff can recover for."

I cannot concur in this view of the case. It does not appear to me that the test for ascertaining the damages, as stated by the judge, is the true one. When the plaintiff conveyed the lands to the defendants, the dams and embankment were finished, and already on them. Both parties must have taken into consideration their existence and future effects; and so long as they remained in their then condition, the defendants could not be responsible to the plaintiff for damages produced by them, but which would not have occurred if the river had remained in its original condition. The plaintiff's deed precludes him from making such a claim. The defendants were bound to keep the dam and embankment in as good condition as they then were; and if they failed to do so, either from alterations, negligence, or ordinary accidents, and in consequence of such failure the plaintiff sustained damages, the proper measure of damages would have been the difference between the injury thus produced, and what it would have been had the dams and embankment remained as they were at the time of the conveyance. When, therefore, the judge instructed the jury that the measure of damages by which their verdict was to be governed was the difference between the injury actually done, and what it would have been if the dams and embankment had never been erected, he committed an error which necessarily misled the jury, and which I am bound to suppose led to an erroneous verdict.

It was suggested that the judge, in another part of his charge, has taken a different view of this part of the case.

I am aware that, in the early part, some statements are made that seem inconsistent with the portion excepted to; and if we certainly knew which view of the case the jury were governed by, we would know whether any mischief had been done by the party complained of or not. But this we cannot know. We cannot possibly tell; but it is sufficient, I think, to know that the jury may have been governed by the erroneous part, and if so, that wrong has certainly been done.

The language embraces a distinct paragraph in the charge. It seems to have been deliberately written and delivered to the jury, and as it appears to be the final conclusion of the judge's views on that part of the case—for he does not again recur to it—and the furnishing to the jury of a definite test or standard by which they were to ascertain the amount of damages done, it seems difficult to suppose that the jury were not influenced by it. To suppose they were not, is to suppose that a jury would disregard the instruction of the court in a matter of law—an idea that cannot be entertained.

There are other exceptions taken and urged, but as their decision is not necessary to a determination of the case, I have not deemed it material to consider them. I think, therefore, that the judgment should be reversed.

Judgment affirmed.